_____

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO
_____

| | |
|---|---|
| **In Re:** | |
| **CHRISTINA M. VARNEY,** | **Bankruptcy Case** **No. 10-41896-JDP** |
| **Debtor.** | |

_____

## MEMORANDUM OF DECISION
_____

Appearances:

    John O. Avery, Idaho Falls, Idaho, for Attorney for Debtor.

    Daniel Green, RACINE OLSON NYE BUDGE & BAILEY, CHARTERED, Pocatello, Idaho, Attorney for Chapter 7 Trustee Gary L. Rainsdon.

### *Introduction*

    In this difficult case, the chapter 7[1] trustee, Gary L. Rainsdon

_____

    [1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

MEMORANDUM OF DECISION – 1

("Trustee"), objects to the claim of exemption made by Debtor Christine
Varney in certain Social Security Disability award funds that she received
shortly after filing her bankruptcy petition.  Because Debtor failed to
disclose the receipt of such funds, and spent the bulk of the money prior to
claiming it as exempt, Trustee argues that her claim was made in bad faith.
An evidentiary hearing was conducted on Trustee's objection on March 22,
2011, and the matter was thereafter taken under advisement.

The Court has considered the submissions of the parties, the
testimony and evidence presented, the arguments of counsel, as well as the
applicable law.  This Memorandum constitutes the Court's findings of fact
and conclusions of law, and disposes of the motion.  Fed. R. Bankr. P. 7052;
9014.

### *Findings of Fact*

A number of years ago, Debtor was diagnosed with ovarian cancer.
On about April 1, 2008, she applied for Social Security Disability ("SSD")
benefits and was twice denied.  *See* Ex. 115.  After the second denial,
Debtor again appealed, and was granted a hearing before an

MEMORANDUM OF DECISION – 2

administrative law judge.  She was represented by the law firm of Binder & Binder throughout the application and appeal process.

In part due to medical bills and a divorce in June 2009, Debtor experienced financial problems.  During August 2009, Debtor met with bankruptcy attorney John Avery, to discuss the possibility of filing a petition for relief in bankruptcy.  At some point in time not clear in the record, Debtor informed Avery about her pending SSD claim, but, since it had been twice denied, she informed him that she held little hope that the claim would ever prove fruitful.  Avery indicated to Debtor that, even if she were to receive SSD benefits, they would be exempt from reach by a bankruptcy trustee and her creditors.

On June 10, 2010, Debtor signed a bankruptcy petition and proposed schedules that Avery had prepared.  However, because she did not have the money to fully compensate him for representing her in a bankruptcy case, the petition and schedules were not filed.  Debtor's pending SSD claim was not listed on any of Debtor's schedules nor referenced in her Statement of Financial Affairs.

MEMORANDUM OF DECISION – 3

On October 1 or 2, 2010, a hearing in connection with Debtor's SSD claim occurred before an administrative law judge in Twin Falls, Idaho. The judge informed Debtor that a decision on her appeal of the denial of benefits would be issued in six to eight weeks.

On October 25, 2010, Debtors' parents paid $500 to Avery so that Debtor's bankruptcy petition could be filed. Debtor's chapter 7 petition and schedules, reviewed and signed by Debtor months before, were filed the following day. Docket No. 1. While Debtor testified before this Court, she was not asked about the details of her communications with Avery between the date the schedules were prepared and signed in June, and when they were filed in October. However, during his closing argument at the hearing, in response to the Court's question, Avery indicated that he conferred with Debtor prior to filing the petition and schedules in October, and Debtor had indicated that nothing had occurred between those dates which would require the schedules to be updated before filing.

On October 29, 2010, Debtor was informed by Binder & Binder that the administrative law judge had ruled in her favor on her SSD benefits

MEMORANDUM OF DECISION – 4

claim appeal; on November 1, 2010, Debtor received a check in the amount

of $37,696, which represented retroactive benefits from April, 2007 –

September, 2010.[2]  Exs. 115, 211, 212, 214.  That same day, Debtor took the

benefits check to Magic Valley Bank, where her father, Anthony Kevan

("Kevan"), worked as a commercial loan officer.  With his advice and

assistance, she opened a savings account in Kevan's name, but for which

she had "signing rights," allowing her to withdraw funds.[3]  Debtor

deposited the entire SSD check into the savings account, and immediately

withdrew $12,696 from the account.  Ex. 214.

　　　　She used some of the withdrawn funds to pay creditors.  Docket No.

1; Exs. 214 – 226.[4]  And it appears that some of the creditors receiving

---

　　　　[2] Debtor was also awarded benefits "going forward" in the amount of
$965 per month, together with annual cost-of-living adjustments.  Ex. 115.

　　　　[3] Both Debtor and Kevan testified that they could not remember whether
Debtor's name was listed on the account, or whether she was merely a signatory,
which the Court understands to mean that she had the right to access funds in
the account.  There is no evidence before the Court that Debtor's name appears
as an owner of the account; thus the Court finds that Debtor had signing rights
only.

　　　　[4] Ex. 215 is a handwritten list, prepared by Debtor, indicating how the
SSD funds were spent.  However, some of the amounts listed do not correspond

MEMORANDUM OF DECISION – 5

payments had been listed on Debtor's bankruptcy schedules, while others

had not.[5]  In addition, some of the paid creditors clearly held prepetition

debts, while others may have been post-bankruptcy, or a combination of

both.[6]

Debtor made several other withdrawals from the savings account

totaling $22,500 during the course of the next month, leaving a balance in

the account of $2,150 as of December 1, 2010.  Ex. 214.  One of the

---

to the amounts on the money orders used to make the payments, copies of which
are  in the record.  In addition, Ex. 215 indicates that $5,500 of the funds were
paid by Debtor to her parents, but this item is disputed by Kevan, who testified
that he and his wife only received $3,916 from Debtor.  The $3,916 figure is
corroborated by Ex. 226, which is a copy of a money order paid to Qwest.
However, handwritten at the top of the exhibit are the words, "$3916.00  Mom &
Dad".  Debtor was not asked to explain either the discrepancy or the handwritten
notation on Ex. 226.

[5] Debtor testified that when she mentioned that she owed debts to her
parents and her good friend, Teresa Dean, Avery asked whether those
individuals would ever "sue" her to collect for the amount owed.  When Debtor
replied that she believed they would never seek to collect, Avery decided those
creditors need not be included on the schedules.

[6] Certain debts, such as the $725 paid to Jim Meservy, was likely a
prepetition debt.  Docket No. 1; Ex. 227.  On the other hand, the amounts paid to
Debtor's friend, Teresa Dean, may have satisfied both pre - and post-petition
obligations.  Docket No. 216, 217.  The evidence is unclear whether the amounts
Debtor paid to utilities and medical providers were incurred before or after
bankruptcy.

MEMORANDUM OF DECISION – 6

withdrawals was for $18,300, on November 29, 2010, which funds were utilized to purchase a 2004 Dodge Durango. Exs. 228 – 232.

On December 6, 2010, the § 341(a) meeting of creditors in Debtor's bankruptcy case was held. At the meeting, Debtor testified that the information contained in her bankruptcy schedules was true and correct. Moreover, when questioned by Trustee about her mode of transportation, she testified that she had been borrowing a friend's car, which is the vehicle she had driven to the meeting. She failed to inform Trustee that she had purchased the Durango just over one week earlier. When questioned about these matters at the hearing before this Court, Debtor testified that her responses to Trustee's questions had indeed been truthful, in that she had driven the car she had been borrowing for several months to the § 341 hearing because her Durango was in the shop for repairs that day, and that, in fact, she had not yet taken possession of the Durango. As for why she failed to mention her purchase of the Durango to Trustee, Debtor stated that it was her understanding that she should testify as to the facts as they existed on the petition date, and that she need

MEMORANDUM OF DECISION – 7

not testify about events that had occurred in the interim.  Ex. 233.

After the creditors meeting, Trustee's research revealed that Debtor had a vehicle registered in her name.  He telephoned Avery to inquire about it.  Avery, in turn, called Debtor and asked about the car, and where she obtained the funds to purchase it.  It was at that point that Avery was informed about Debtor's receipt of the SSD award proceeds.

During her meeting of creditors testimony, Debtor had likewise omitted any mention of the SSD award.  However, there apparently was a brief conversation between Avery, Debtor, and Kevan immediately following the meeting.  During that conversation, Kevan expressed concern about the effect of the bankruptcy on the SSD money Debtor had received.  Debtor testified that, after the § 341 meeting, she and Kevan spoke to Avery about the SSD money, but Debtor believes that Avery did not realize the money had already been received; rather, it was her impression that Avery thought the parties' discussions assumed, hypothetically, the benefits would be awarded at some future time.  Apparently, Avery told her, the benefit funds would be exempt when

MEMORANDUM OF DECISION – 8

awarded.

In addition, some time subsequent to receiving notice that she had

been granted SSD benefits, and after receipt of the SSD check, Debtor was

sent paperwork to complete to claim benefits for her six year old daughter.

She filled out this paperwork in late-November or early-December, and

returned it.  The result of this application was a separate SSD award for

the benefit of her daughter, and on December 21, 2010, Debtor deposited

$20,000 in the savings account which represented SSD monies received for

her daughter.  It is unclear whether the daughter receives ongoing

payments, or whether this amount was a lump sum award.  Debtor's

bankruptcy schedules were not amended to reflect the existence of this

claim, nor receipt of the award, and in fact, it appears that Avery was not

informed by Debtor of her receipt of the daughter's SSD payment until a

few days prior to the exemption hearing.  Debtor testified that she

considered the money her daughter's, and did not think of it as her own.

On December 28, 2010, Trustee filed a motion for turnover with the

Court in which he sought to recover possession of the Durango; Debtor

MEMORANDUM OF DECISION – 9

responded to the motion on January 18, 2011.  Docket Nos. 18, 20.  That

same day, Debtor filed an amended schedule B to, for the first time, list the

SSD claim and award proceeds as an asset in the amount of $34,000; she

also amended her schedule C to claim the full $34,000 award exempt

under Idaho Code § 11-603(3).[7]  Docket No. 19.[8]

On February 9, 2011, Trustee filed an objection to Debtor's claimed

exemption in the SSD funds. Docket No. 29.  On February 22, 2011, Debtor

responded.  Docket No. 31.

### Conclusions of Law

### A.

When a bankruptcy petition is filed, "all legal or equitable interests

of the debtor in property" become the property of the bankruptcy estate,

---

[7]  Recall, Debtor received $37,696 on or about November 1, 2010, and thus
has not claimed $3,696 of those initial benefits as exempt.

[8]  On March 10, 2011, after a hearing, the Court granted Trustee's turnover
motion.  Docket No. 36.  The order required that the Durango be surrendered to
Trustee unless satisfactory arrangements were made by Debtor with Trustee to
keep the vehicle insured, parked and safe pending the outcome of these
proceedings.

MEMORANDUM OF DECISION – 10

and are available for distribution to creditors. *Rousey v. Jacoway*, 544 U.S. 320, 325 (2005) (quoting § 541(a)(1)). All proceeds of property of the estate are also included in the estate. § 541(a)(6). To allow debtors a financial fresh start after bankruptcy, however, the Code permits them to shield, or exempt, certain interests in property from administration in the bankruptcy case. *Id*.; *In re Grimmett*, 10.1 I.B.C.R. 30, 31 (Bankr. D. Idaho 2010); *see e.g.*, 11 U.S.C. § 522(d). As provided in the Code, because Idaho has "opted out" of the Code's exemption scheme, debtors in this state may claim only those exemptions allowed under Idaho law, as well as those listed in § 522(b)(3). *In re Grimmett*, 10.1 I.B.C.R. at 31; 11 U.S.C. § 522(b)(3)(A); Idaho Code § 11-609.

As the objecting party, Trustee bears the burden of proving that Debtors' claims of exemption are not proper. Rule 4003(c); *In re Kline*, 350 B.R. 497, 502 (Bankr. D. Idaho 2005). The validity of a claimed exemption is determined as of the date of filing of the bankruptcy petition. 11 U.S.C. § 522(b)(3)(A); *Culver, L.L.C. v. Chiu (In re Chiu)*, 226 B.R. 743, 751 (9th Cir. BAP 2001); *In re Yackley*, 03.1 I.B.C.R. 84 (Bankr. D. Idaho 2003).

MEMORANDUM OF DECISION – 11

Exemption statutes are to be liberally construed in favor of Debtors. *In re Kline*, 350 B.R. at 502 (citing *In re Steinmetz*, 261 B.R. 32, 33 (Bankr. D. Idaho 2001).

**B.**

Debtor's SSD claim for benefits, because it existed at the time she filed her petition, became property of the bankruptcy estate. The same is true as to the funds paid to her after bankruptcy on account of that claim.

While she did not schedule, nor claim as exempt, her SSD claim in her bankruptcy schedules filed in October, 2010, Debtor amended her schedules in December to list and claim the SSD funds she received after bankruptcy as exempt under Idaho Code § 11-603(3). That statute provides:

> **Property exempt without limitation.** — An individual is entitled to exemption of the following property:
> * * * * *
> (3) Benefits the individual is entitled to receive under federal social security, or veteran's benefits, except the restrictions under this subsection shall not apply to enforcement of an order or the support of any person by execution,

MEMORANDUM OF DECISION – 12

> garnishment, or wage withholding under chapter
> 12, title 7, Idaho Code[.]

(emphasis in original).  In other words, Idaho law provides an exemption,

without limitation, for SSD benefits such as those received by Debtor.

However, in order to qualify for any exemption in a bankruptcy

case, the Bankruptcy Code requires that:

> The debtor shall file a list of property that the
> debtor claims as exempt under subsection (b) of
> this section.  If the debtor does not file such a list,
> a dependent of the debtor may file such a list, or
> may claim property as exempt from property of
> the estate on behalf of the debtor.  Unless a party
> in interest objects, the property claimed as
> exempt on such list is exempt.

11 U.S.C. § 522(l).  All state law exemptions are provided for in

§ 522(b)(3)(A), and thus are subject to the requirement that Debtor file a list

of property claimed as exempt.  The Bankruptcy Rules echo this

requirement as they provide that a debtor "shall list the property claimed

as exempt under § 522 of the Code on the schedule of assets required to be

filed by Rule 1007."  Rule 4003(a).  The reasoning behind this requirement

is clear:

MEMORANDUM OF DECISION – 13

It is mandatory under the language of the statute
that the debtor file a list of the property he claims
exempt.  11 U.S.C. § 522(l).

Even without the statutory mandate, the
practicalities of bankruptcy administration
require that the trustee be advised of the precise
items of property in the estate, 11 U.S.C. § 541(a),
that the debtor elects to withdraw from the estate.
The trustee needs this information in order to
judge the validity of the exemption claim and to
know what property remains in the estate for
purposes of liquidation.

*Moldo v. Clark (In re Clark)*, 266 B.R. 163, 169-70 (9th Cir. BAP 2001) (citing

*Andermahr v. Barrus (In re Andermahr)*, 30 B.R. 532, 533 (9th Cir. BAP 1983));

*Preblich v. Battley*, 181 F.3d 1048, 1052 (9th Cir. 1999) (debtor must file list

of property he claims exempt).

After a debtor has duly listed the property he or she claims as

exempt on schedule C, the burden then shifts to trustee and other

interested parties to police the debtor's claims of exemption.  Rule 4003(b)

provides a thirty-day window in which to object to those claims, beginning

from the § 341(a) meeting of creditors, or from any amendment made to

schedule C, whichever is later.  *Id*.  If no objection is filed within the

MEMORANDUM OF DECISION – 14

statutory objection period, "the property claimed as exempt on [schedule

C] is exempt." § 522(l); *see also, Mwangi v. Wells Fargo Bank, N.A. (In re*

*Mwangi)*, 432 B.R. 812, 821 (9th Cir. BAP 2010) (noting that "[p]roperty

claimed as exempt leaves the estate and revests in the debtor." (*quoting*

*Kretzer v. DFW Fed. Credit Union (In re Kretzer)*, 48 B.R. 585, 588 (Bankr. D.

Nev. 1985))).

    Because even potentially exempt assets nonetheless become

property of the estate upon the commencement of the bankruptcy case, the

filing and asserting of a proper exemption claim is not a procedural step

that may be skipped by a debtor, even if it appears that the property

involved in unquestionably exempt, as the SSD benefits would appear to

be here. Until exemptions are properly claimed, and the trustee and

creditor are given an opportunity to object to allowance, assets remain

property of the estate subject to the trustee's control. The mechanics of the

Code and Rules must be respected.

    In this case, Debtor's SSD benefit payments were ultimately claimed

as exempt, albeit in a much-belated fashion. However, prior to that time,

MEMORANDUM OF DECISION – 15

when discussing her pending SSD claim, Avery informed his client that

any such funds received would be exempt.  It is unclear, however, whether

Avery informed Debtor about the mechanics of the exemption process in

bankruptcy:  that she must list those benefits on schedule B and claim

them exempt on schedule C, and wait for the thirty day objection period to

pass, before the SSD funds would actually be exempt and hers to spend as

she chose.

Regardless of the details of the discussions between attorney and

client in this case, though, Debtor's bankruptcy petition, statements and

schedules are sworn under penalty of perjury to be true, correct and

complete, and Debtor bore an independent responsibility to ensure the

accuracy of the information contained therein.  *AT&T Universal Card Servs.*

*Corp. v. Duplante (In re Duplante)*, 215 B.R. 444, 447 n.8 (9th Cir. BAP 1997);

*Palmer v. Downey (In re Downey)*, 242 B.R. 5, 15 (Bankr. D. Idaho 1999)

(holding that "attorney error does not absolve a debtor who signs the

petition and schedules under penalty of perjury, from the duty to ensure

the information is accurate and complete to the best of his knowledge").

MEMORANDUM OF DECISION – 16

And there can be no doubt in this case that Debtor's October schedules

were not correct or complete when they were filed.

## C.

Trustee has objected to Debtor's claim of exemption in the SSD

funds because, he argues, Debtor has engaged in bad faith conduct in

connection with her bankruptcy case.  Specifically, Trustee contends that

Debtor exhibited bad faith through at least four acts:

> 1)  failing to disclose the pending SSD claim in her original
> schedules;
> 2) failing to disclose receipt of the SSD funds;
> 3) failing to disclose the SSD claim and receipt of the funds, and the
> vehicle purchased with those funds, when questioned by Trustee
> during the § 341 meeting; and
> 4)  providing information to Trustee, after having been confronted
> with the facts, that did not fully and accurately address these
> matters.

Docket No. 29.  Trustee contends Debtor's bad faith is an appropriate basis

to disallow her otherwise valid claim of exemption in the SSD award

proceeds, including the Durango, in this case.   Debtor disagrees.

1.  The Bad Faith Standard.

A bankruptcy court may disallow a claim of exemption if the debtor

MEMORANDUM OF DECISION – 17

has engaged in bad faith.  *Martinson v. Michael (In re Michael)*, 163 F.3d 526,

529 (9th Cir. 1998); *Tyner v. Nicholson (In re Nicholson)*, 435 B.R. 622 (9th Cir.

BAP 2010) (citing *In re Andermahr*, 30 B.R. at 533).  The existence of a

debtor's bad faith must be proved by a preponderance of the evidence.  *In*

*re Nicholson*, 435 B.R. at 634.  Moreover, bad faith is determined by

examining the totality of the circumstances.  *Id*.

      A debtor's concealment of assets is one common example of conduct

supporting a finding of bad faith.  *In re Hoffpauir*, 258 B.R. 447, 452 (Bankr.

D. Idaho 2001) (observing that "[b]ad faith must be evaluated on the

entirety of the evidence, and generally involves consideration of whether

debtors have attempted to conceal assets").  Courts may infer that a debtor

has intentionally concealed assets based upon the facts and circumstances

of a case, including where non-disclosure results from a debtor's reckless

disregard for the truth and accuracy of information furnished in the

bankruptcy schedules and statements.  *See, e.g., In re Rolland*, 317 B.R. 402,

415 (Bankr. C.D. Cal. 2004) (debtors' conduct surrounding the sale of their

home, as well as the timing of the amended exemption claim plus other

MEMORANDUM OF DECISION – 18

inconsistencies in their schedules led to a conclusion of bad faith); *In re
Colvin*, 288 B.R. 477, 482 (Bankr. E.D. Mich. 2003) (denying debtor's
amended claim of exemption upon finding that the failure to disclose a
$10,000 tax refund "resulted from a cavalier and reckless intention
regarding their disclosure obligations"); *Henkel v. Green (In re Green)*, 268
B.R. 628, 648 (Bankr. M.D. Fla. 2001) (stating that a debtor's failure to
promptly amend schedules to correct errors and omissions made under
oath "can be considered reckless indifference to the truth and is
tantamount to fraud").

 2.  Analysis.

  Trustee contends Debtor intentionally concealed assets in this case,
and that such bad faith conduct is a proper basis to deny her the right to
exempt the assets.  As evidence, he points to Debtor's failure to disclose
her pending SSD claim in her schedules, and at the meeting of creditors,
her failure to disclose she had received the SSD award payment, her
failure to disclose her purchase of the Durango, and her use of large
amounts from these funds to make payments to preferred creditors.

MEMORANDUM OF DECISION – 19

Debtor insists she was unaware of any obligation to make such

disclosures.

   While it is true that the Debtor did not list her pending SSD claim on

her schedules or Statement of Financial Affairs, it is undisputed that she

did indeed disclose the pending claim to her attorney while discussing her

desire to file for bankruptcy relief.  While the evidence is subject to

competing interpretations, the Court finds that Debtor's failure to list the

potential asset in her bankruptcy schedules resulted from Debtor's belief

that the pending claim would not result in any significant benefit

payments, rather than an attempt to conceal an asset.  The SSD claims

process in this case had been going on for several years prior to Debtor's

bankruptcy filing, and Debtor's claim had been denied twice by the agency

already.  While it is regrettable that Debtor failed to update her schedules

prior to filing, since she had appeared in a hearing before an an

administrative law judge less than a month earlier, it is unclear to the

Court whether she ever informed Avery about the hearing before her

petition was filed.  Even so, the Court finds credible Debtor's testimony

MEMORANDUM OF DECISION – 20

that even after the hearing, she believed her latest endeavor to obtain SSD

benefits on appeal was likely to fail, as it had before.[9]

Trustee also points to the fact that Debtor failed to disclose the SSD

award payment when it was received as additional evidence of her bad

faith.  Trustee contends this is especially noteworthy given that Debtor

received $37,696 less than one week after her bankruptcy petition was

filed.  Trustee notes that Debtor then immediately placed the money in a

savings account in another's name, but to which she had access.

The Debtor testified that Avery had previously told her that any

money she received in SSD benefits would be exempt, so she felt

unconstrained by her bankruptcy to deal with the funds, and felt no real

need to tell her bankruptcy counsel about it.  She and Kevan also

---

[9] Obviously, Debtor's decision to omit the existence of even a meritless
SSD claim from her sworn bankruptcy schedules was ill-advised.  It was not
Debtor's prerogative to decide the claim was of no consequence to Trustee or her
creditors.  Moreover, the Court is perplexed about how her experienced
bankruptcy attorney would allow such an omission to occur after hearing from
Debtor that an "old" SSD claim existed.  However, in this instance, the narrow
question presented is whether Debtor's omission of such information amounted
to a willful attempt to conceal this information.  The Court finds it did not.

MEMORANDUM OF DECISION – 21

explained why the bank account was not set up in her name. It seems the

bank had taken a loss on a loan made to Debtor and her spouse in the past,

and as a result, would not likely favor having her as a customer again. In

spite of Debtor's credit reputation, Kevan, as a bank officer, could open an

account to which Debtor would have access without difficulty. Moreover,

Kevan's belief was that, because this was a savings account, not a checking

account, it could not be overdrawn, and Debtor would be unable to spend

beyond the amounts deposited in the account, and would not incur any

additional fees or bank charges. In sum, Debtor believed that the SSD

award money was exempt, and she and her father concocted a scheme to

deposit the money in an account she could access.

Trustee is also justifiably concerned with Debtor's answers to

questions both during and after the December 6, 2010 meeting of creditors.

While the Court was not given a transcript of the hearing, it is undisputed

that Debtor, after reaffirming that her filed schedules were indeed correct,

did not disclose her receipt of over $37,000 shortly after the petition was

filed. On the other hand, the record does not show whether Trustee

MEMORANDUM OF DECISION – 22

inquired of Debtor whether she had received assets in the interim between

the filing date and the meeting.  Moreover, Trustee specifically noted that

Debtor did not have a vehicle listed as an asset on her schedules, and

inquired about how she was able to get around.  Debtor testified truthfully

that she had been borrowing a vehicle from a friend, and that she had

driven that borrowed car to the meeting.  However, she did not disclose

her purchase of the Durango only nine days prior.  This seems especially

curious, given the context of Trustee's inquiries about not having a vehicle

listed on her schedules.  Even so, Debtor testified that she was instructed

by her counsel to testify as to the facts as they existed on petition day.  This

testimony was corroborated by Kevan, who was present the day of the

meeting, although it is unclear whether he actually heard Avery instruct

Debtor to testify in this manner, or whether Debtor simply related this

advice to Kevan after the fact.  Regardless, Kevan expressed his opinion

that he was not surprised that Debtor did not mention the Durango during

the hearing, as she did not own it on petition day.

There was also testimony concerning what occurred after the

MEMORANDUM OF DECISION – 23

§ 341(a) creditor's meeting.  Following that meeting, Avery, Debtor and

Kevan spoke together for a few minutes.  Kevan testified that, at that time,

he was concerned about Debtor's receipt of the SSD funds, and whether

they would be "subject to the bankruptcy."  When Kevan asked about the

effect of bankruptcy on the SSD funds, Avery apparently understood his

question to be hypothetical in nature, and he simply informed Kevan and

Debtor that any such funds would be exempt.  This was corroborated, in

part, by Avery, who, while asking his client a number of leading questions

during her testimony, informed the Court that he learned of the purchase

of the Durango from Trustee, who called him at some point after the § 341

meeting to ask about the Durango titled in Debtor's name.  Avery then

called the Debtor and asked about the car, where she got the money to buy

it, and learned of the receipt of the SSD funds at that time.

　　　　Finally, Trustee contends that Debtor provided a statement to him,

after having been confronted with Trustee's knowledge of the facts, that

did not fully and accurately address his concerns.  While not specifically

addressed at the exemption hearing, the Court assumes Trustee is

MEMORANDUM OF DECISION – 24

referring to Exhibit 213, a copy of Debtor's handwritten note to Trustee,

which states the following:

> I, Christina Varney, had applied for Social
> Security Disability over 3 years ago and was not
> expecting to receive anything as it has been
> repeatedly denied.  After my bankruptcy filing I
> received an award letter and a check for about
> $34,000.  I recently ammended [sic] my schedules
> after contacting my attorney [sic] to the change in
> circumstances.

Ex. 213.  While his argument is imprecise, the Court presumes Trustee's

concern has to do with Debtor's understatement of the amount of SSD

benefits she received by almost $3,700, as well as the fact that Debtor states

in this note that she contacted her attorney regarding the change in her

circumstances so schedules could be amended.  With regard to the

amount, Debtor seems to be laboring under the impression that she

received $34,000, as that was the amount she listed on her amended

schedules B and C.  As to her version of the facts about contacting her

attorney to inform him of her change in circumstances, it is true that

Debtor was not particularly forthcoming about the receipt of the money to

MEMORANDUM OF DECISION – 25

either her counsel or Trustee, and only when she was essentially "found out" did she take the steps to amend her schedules and claim the funds received as exempt.

3. Disposition.

While it is an extremely close case, the Court finds and concludes that, after reviewing the totality of the circumstances here, Trustee has not demonstrated Debtor was guilty of bad faith.

The Court considers this to be a very difficult call. Debtor's actions and omissions could be reasonably construed as evidence of an intent to conceal assets. Even so, Debtor's explanations for her omissions, and the corroboration by her father and, to some extent, Avery, seem to suggest otherwise. In deciding the issues, the Court has carefully considered the facts and circumstances, as well as the demeanor and credibility of the witnesses. Somewhat reluctantly, the Court finds and concludes that Trustee has not met his burden of proving that Debtor was more likely than not intentionally attempting to conceal assets, and thereby, was guilty of bad faith such that her exemption claim ought to be disallowed.

MEMORANDUM OF DECISION – 26

Trustee argues that Debtor's approach to her bankruptcy case evidenced a reckless indifference to the truth and rises to the level of an intent to deceive.  As noted above, this is a very close question.  One would assume that a reasonable person, upon receiving over $37,000 within a week of filing for bankruptcy relief, would promptly contact her bankruptcy attorney to inform him of the award and to ensure it was appropriate that she spend the money.  In addition, when the trustee inquired about her source of transportation, one would think that a debtor, even one who had been instructed by counsel to testify about the facts as they existed on petition day, might mention her post-bankruptcy purchase of a Durango.  But while Debtor's actions were questionable, considering the totality of the circumstances, and the demeanor of all of the witnesses, the Court cannot find that Debtor was so recklessly indifferent to the truth that her actions give rise to an inference of the intent to conceal the assets. Admittedly, Debtor was not as cautious as she should have been; indeed, her father exercised more caution and asked more relevant questions than she did.  Nonetheless, the Court declines to conclude that Debtor's lack of

MEMORANDUM OF DECISION – 27

concern rose to the level of an intent to deceive the Trustee or the Court.

### *Conclusion*

Trustee has not proven by a preponderance of the evidence that

Debtor intended to conceal the SSD benefits or the vehicle she purchased

with them.  As a result, Trustee's objection to Debtor's claim of exemption

is denied.

A separate order will be entered.

Dated:  April 25, 2011

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 28